UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| QIMONDA AG, | |
| Plaintiff, | |
| v. | Civil Action No. 3:08-CV-735 |
| LSI CORPORATION, | |
| Defendant. | |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on LSI Corporation's ("LSI") Motion to Dismiss

Under Rule 12(b)(1) for Lack of Standing. (Doc. No. 26.) For the reasons stated below, the

Court GRANTS the Motion.

## I.    BACKGROUND

The following facts are undisputed. Qimonda AG ("Qimonda"), a German

corporation based in Munich, filed this patent infringement suit against LSI on November

12, 2008. The Complaint alleged infringement of seven United States patents assigned to

Qimonda.[1] Soon after this suit was filed, Qimonda filed a similar United States International

Trade Commission ("ITC") administrative action against LSI. Pursuant to 28 U.S.C. §

1629(a), this suit was stayed pending the final determination of the ITC. On November 1,

2011, upon confirmation from the parties that the ITC determination had become final, the

Court lifted the stay in this matter. (*See* Doc. No. 23.)

While this action was stayed, and during the ITC's patent infringement investigation

under 19 U.S.C. § 1337, Qimonda entered into insolvency proceedings in Germany by filing

---

[1] Those patents are U.S. Patent Nos. 5,213,670; 5,646,434; 5,851,899; 6,103,456; 6,495,918;
6,593,240; and 6,714,055.

an application with the Amtsgericht-Insolvenzgericht München ("Munich Insolvency

Court"). Under the German Insolvency Code, insolvency proceedings are opened by an

"Insolvency Order," which among other things appoints an insolvency administrator to take

possession of and administer the debtor's estate. (*See* Schlegel Decl. ¶¶ 9–10.) In opening

Qimonda's insolvency action in Germany, the Munich Insolvency Court entered an order on

April 1, 2009 which appointed Dr. Michael Jaffé ("Jaffé") as Qimonda's insolvency

administrator.[2]

On June 15, 2009, Jaffé filed a petition for recognition of a foreign proceeding under

Chapter 15 of the United States Bankruptcy Code with the United States Bankruptcy Court

for the Eastern District of Virginia.[3] Enacted by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005, Chapter 15 is purposed "to provide effective mechanisms

for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a). Chapter 15 replaced

the former Section 304 of the Bankruptcy Code, and incorporated the Model Law on Cross-

Border Insolvency drafted by the United Nations Commission on International Trade Law.

*Lavie v. Ran* (*In re Ran*), 607 F.3d 1017, 1020 (5th Cir. 2010). "The statutory intent to

conform American law with international law is explicit in the text of Section 1501(a), and

also is expressed in Section 1508, which states that '[i]n interpreting this chapter, the court

shall consider its international origin, and the need to promote an application of this

chapter that is consistent with the application of similar statutes adopted by foreign

jurisdictions.'" *Id.* at 1020–21 (quoting 11 U.S.C. § 1508).

---

[2] *In re Qimonda AG*, No. 09-14766-RGM, slip op. at 2 (Bankr. E.D. Va. Oct. 28, 2011), Doc. No. 635.
[3] Petition for Recognition of Main Foreign Proceeding, *In re Qimonda AG*, No. 09-14766-RGM (Bankr. E.D. Va. June 15, 2009), Doc. No. 1.

Jaffé's petition to the Bankruptcy Court asked the United States to recognize the German insolvency proceeding as a foreign "main" proceeding, i.e., to recognize the German proceeding as the one "pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). Upon recognition, the foreign representative may take advantage of a broad range of relief. *Ran*, 607 F.3d at 1021. Pertinent to this Motion, upon recognition the Bankruptcy Court may formally "entrust[ ] the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the [debtor's] foreign representative." 11 U.S.C. § 1521(a)(5).

On July 22, 2009, the Bankruptcy Court entered an order recognizing the German insolvency proceeding as a foreign "main" proceeding under Chapter 15.[4] Later the same day, the Bankruptcy Court entered a supplemental order declaring Jaffé "the sole and exclusive representative of Qimonda AG in the United States," and stating that Jaffé "shall administer the assets of Qimonda AG within the territorial jurisdiction of the United States."[5]

In that capacity, Jaffé has determined that Qimonda should be liquidated, and that Qimonda's most valuable assets—its patents—should be monetized through licensing, sales, and infringement litigation. As the manager and sole representative of Qimonda, Jaffé approves of this litigation.

LSI's Motion to Dismiss for Lack of Standing centers on Jaffé's status as Qimonda's insolvency administrator. LSI's argument that Qimonda now lacks standing to bring this patent infringement suit has two threads: (1) Qimonda's insolvency estate includes the

---

[4] Order Recognizing Foreign Main Proceeding of Qimonda AG, *In re Qimonda AG*, No. 09-14766-RGM (Bankr. E.D. Va. July 22, 2009), Doc. No. 56.
[5] Supplemental Order on Petition for Recognition of Foreign Proceeding, *In re Qimonda AG*, No. 09-14766-RGM (Bankr. E.D. Va. July 22, 2009), Doc. No. 57.

causes of action for patent infringement asserted in this case; and (2) Jaffé, vested with plenary ownership and control over Qimonda's insolvency estate, is the only party able to pursue them. Qimonda, asserts LSI, is divested of ownership and control, and now lacks standing to assert the infringement claims alleged in this lawsuit.

## II.   LEGAL STANDARD

The burden of proving subject matter jurisdiction in response to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) is on the plaintiff. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). This is because"[i]t is to be presumed that a cause lies outside th[e] limited jurisdiction" of the federal courts. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Defendants can challenge subject matter jurisdiction by two different methods. By the first method, a defendant may assert "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In such a "facial" challenge to subject matter jurisdiction, the court treats the jurisdictional challenge just as it would a motion to dismiss under Rule 12(b)(6)—it assumes that the facts in the complaint are true and determines whether they are sufficient to confer jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

In contrast, when considering a "factual" or "substantive" challenge to subject matter jurisdiction under Rule 12(b)(1), courts apply the standard associated with motions for summary judgment. *See id.* at 192–93; *see also Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The summary judgment standard applies in these challenges because the defendant's claim is that the "jurisdictional allegations of the complaint [are] not true." *Adams*, 697 F.2d at 1219. Therefore, upon a

4

substantive challenge to subject matter jurisdiction, the nonmoving party must set forth

facts demonstrating that a genuine issue of material fact exists, and "[t]he moving party

should prevail only if the material jurisdictional facts are not in dispute and the moving

party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R.*,

945 F.2d at 768.

> III.    **DISCUSSION**

>> **A.**

Before turning to the merits of LSI's Motion, an initial issue not raised by the

parties—that of the proper characterization of this jurisdictional challenge—should be

addressed. LSI styles its challenge to the Court's subject matter jurisdiction as a Motion to

Dismiss for Lack of Standing. Whether a plaintiff has standing, however, is tested at the

time the case is filed. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992)

(plurality opinion) ("[S]tanding is to be determined as of the commencement of suit.");

*Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003). *Cf.*

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) ("The existence of federal

jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). The

question of whether the Court *loses* jurisdiction over a case where a plaintiff has standing at

the outset, then, is properly characterized as one of mootness.

The Supreme Court elaborated on this distinction in *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000). In *Laidlaw*, the Supreme Court

reversed the court of appeals's determination that the action was moot. Separately

addressing the issues of standing and mootness, the Court first found that the plaintiffs met

Article III's standing requirements, and then addressed the issue of whether the

defendant's voluntary compliance with certain environmental requirements rendered the action moot. *Id.* at 189. In dictum, the Court discussed the oft-cited phrase it had previously adopted to describe the relationship between standing and mootness: "The doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). The Court said that "[c]areful reflection on the long-recognized exceptions to mootness . . . reveal[ed] that the description of mootness as 'standing set in a time frame' [wa]s not comprehensive." *Id.* at 190. Justice Ginsburg's opinion for the Court explained that there are certain circumstances, such as the mootness exception allowing adjudication of issues capable of repetition yet evading review, "in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* If mootness doctrine was nothing more than "standing set in a time frame," wrote Justice Ginsburg, such exceptions could not exist. With this in mind, seven justices in *Laidlaw* intimated acceptance of the notion that the case-or-controversy requirement of Article III may be relaxed at later stages of litigation under a sunk cost rationale. *See id.* at 191–92.[6] But the Court made this much abundantly clear: "Th[e] argument from sunk costs

---

[6] Justice Scalia, joined by Justice Thomas, expressed doubt over the Court's "too-hasty retreat" from the characterization of mootness as "the doctrine of standing set in a time frame." *Laidlaw*, 528 U.S. at 212 (Scalia, J., dissenting). Justice Scalia expressed the view that Article III requires a live case or controversy throughout the litigation, and that exceptions to mootness doctrine exist not because Article III is applied with any less rigor at later stages of litigation, but on the recognition that certain cases *still present* a genuine controversy. *Id.* at 213–14. Thus, on this view, the requirements for standing and mootness do not materially differ, because "[w]here the conduct has ceased for the time being

does *not* license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest." *Id.* at 192 (emphasis added).

LSI does not dispute that Qimonda had standing to sue at the inception of this lawsuit. What it argues is that Qimonda *now* "lack[s] a legally cognizable interest in the outcome," *Powell v. McCormack*, 395 U.S. 486, 496 (1969), as Jaffé was vested with complete ownership and control over Qimonda's assets, namely its patents, upon Qimonda's bankruptcy.[7] Properly framed, this is an issue of mootness. That established, patent infringement standing doctrine is still the Court's guidepost. As the Federal Circuit put it when facing similar issues not long ago, the issue before the Court is whether Qimonda "*lost* standing to sue for infringement and the case became moot." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005) (emphasis added).

As LSI's mootness née standing challenge challenges the *facts* upon which jurisdiction is based, the Court will consider evidence outside the pleadings and apply the standard associated with summary judgment motions.

**B.**

The "standing" requirement derives from Article III of the Constitution, which limits the federal judiciary's role to resolving "cases" and "controversies." To meet Article III's

---

but there is a demonstrated probability that it will recur, a real-life controversy between parties with a personal stake in the outcome continues to exist." *Id.* at 214 (quoting *Honig v. Doe*, 484 U.S. 305, 341 (1988) (Scalia, J., dissenting)) (internal quotation marks omitted).
[7] In certain cases, the issue of standing cannot be resolved until later stages in the litigation. *Lujan* presents a good example: the Court looked to affidavits and depositions produced through discovery in order to determine whether the Plaintiffs had shown injury-in-fact. *Id.* at 563–68. Though it cannot be resolved until a later stage, the issue in those cases is whether the plaintiff has truly alleged constitutionally cognizable injury at the beginning of the litigation—an issue of standing. This case, in contrast, presents the issue of whether an event or circumstance that occurred after filing has sufficiently altered the legal interests of a party who undoubtedly had standing at the beginning.

standing requirement, "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (internal quotation marks omitted). This requirement is traditionally broken down into three independent prongs that must be met in order to satisfy Article III: injury-in-fact, traceability, and redressability. *See, e.g.*, *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007). "But standing 'often turns on the nature and source of the claim asserted. . . . Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Applying this proposition to the patent context, the Federal Circuit has explained that "[since] the patent statutes give rise to the right to sue others for patent infringement, they also define the nature and source of the infringement claim and determine the party that is entitled to judicial relief." *Id.* Under the patent scheme created by Congress, the "patentee" and his successors in title may bring a civil action for patent infringement. 35 U.S.C. §§ 100(d), 281. Successors in title are those that hold *legal title* to the patent. *Morrow*, 499 F.3d at 1339. "A patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. This right to exclude is the legal interest created by statute." *Id.* (citing 35 U.S.C. §§ 154, 271; *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 (Fed. Cir. 1991)). Constitutional injury-in-fact occurs whenever one of the exclusionary rights is violated. *Id.*

For purposes of analyzing constitutional standing, there are three categories of patent infringement plaintiffs: plaintiffs that can sue in their name alone, plaintiffs that can sue so long as the patent owner is joined in the suit, and plaintiffs that cannot participate in the suit at all. *Id.* Plaintiffs that can sue in their own name are the patentees themselves or their assignees—those that hold the entire bundle of legal rights to the patent. *Id.* at 1339–40. Patentees holding all exclusionary rights can sue on their own, and so can those that have been transferred "all substantial rights" in the patent. *Id.* at 1340. The second category of plaintiffs, often identified as exclusive licensees, possess exclusionary rights created by the patent statutes, but not *all* substantial rights. *Id.* "Parties that hold the exclusionary rights are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention." *Id.* These parties must join the actual owner of the patent, because the exclusionary rights granted by statute must be enforced through or in the name of the patent holder. *Id.* (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 467 (1926)). The third category of plaintiffs is composed of those that possess something less than "all substantial rights" to the patent; the rights held by these plaintiffs are insufficient to meet the constitutional injury-in-fact requirement. *Id.*

## C.

Putting aside all of the arguments and authorities cited by the parties, the jurisdictional analysis in this case boils down to the "all substantial rights" inquiry,[8] the

---

[8] While LSI immediately and correctly identified the dispositive issue at the hearing as whether Qimonda retains all substantial rights in the patent, the bulk of the parties' briefing focused on bankruptcy precedents (with the exception of the latter part of LSI's reply brief, which addressed patent licensee standing cases), just as the district court in *Morrow* focused on bankruptcy principles in determining that Spacone had standing to sue

most analogous application of it being the case discussed above, *Morrow*. That decision was cited by the parties only once, for the following proposition: "Unquestionably, a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name." *Id.* at 1339–40. As will be shown below, it is somewhat ironic that Qimonda cited *Morrow* for that proposition, because it is fair to say that it is a succinct expression of the principles that deprive the Court of the ability to adjudicate its suit.

In *Morrow*, the Federal Circuit was faced with the task of determining whether one of three trusts created pursuant to a joint bankruptcy liquidation plan had standing to bring a patent infringement suit in the name of its trustee. 499 F.3d at 1334–35. The three trusts created under the bankruptcy liquidation plan were the General Unsecured Creditors' Liquidating Trust ("GUCLT"), the At Home Liquidating Trust ("AHLT"), and the Bondholders Liquidating Trust ("BHLT"). *Id.* at 1335. Frank Morrow, who was later succeeded by Hank Spacone, was appointed as the trustee of GUCLT.[9] Under the liquidation plan, BHLT was given rights to causes of action against various controlling shareholders of the insolvent corporation, and GUCLT was given rights to all remaining causes of action, including claims for infringement of the insolvent corporation's intellectual property. *Id.* AHLT received ownership rights in the insolvent corporation's intellectual property,

---

for patent infringement. The Federal Circuit rejected the district court's determination that bankruptcy principles governed the standing issue, explaining that as "[t]he patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights," *id.* at 1336, those statutes "have long been recognized as the law that governs who has the right to bring suit for patent infringement, even when patent rights have been transferred as a result of bankruptcy or proceedings in equity." *Id.* at 1337.

[9] As in the Federal Circuit's opinion, references to Spacone are references to his predecessor, Morrow, or GUCLT, when applicable.

including legal title to the patent for which *GUCLT* was given the right to sue on. *Id.* The

question before the Federal Circuit was whether GUCLT's trustee, Spacone, had standing to

sue given the fact that he owned the right to the patent infringement cause of action but not

the patent itself.

After summarizing the three categories of plaintiffs under the "all substantial rights"

standing inquiry, the Federal Circuit framed the issue as "whether GUCLT holds the

exclusionary rights and suffers constitutional injury in fact." *Id.* at 1341. GUCLT's trustee

argued that AHLT merely held "bare" legal title to the patent, and that GUCLT had standing

to sue because it possessed "partial equitable title" to the patent. *Id.* According to the court,

> The question [wa]s whether GUCLT's interests in the patent include
> sufficient exclusionary rights such that GUCLT suffers an injury in fact from
> infringing activities. If GUCLT holds all substantial rights, it can sue in its
> name alone. If GUCLT holds less than all substantial rights but sufficient
> exclusionary rights that it suffers injury in fact, it can sue as a co-party with
> the legal title holder AHLT. If it lacks injury in fact, GUCLT lacks standing to
> be a party to this case.

*Id.*

The Federal Circuit reasoned that the right held by GUCLT—the right to sue—was

an important one. But the court distinguished GUCLT's rights with those of a patent

infringement plaintiff who possessed not only the right to sue but also the patent's

exclusionary rights, including the right to make, use, or sell the patented invention. *See id.*

(citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed.

Cir. 1991)). The court said GUCLT lacked these important exclusionary rights. Instead, they

were possessed by AHLT. Furthermore, the Court noted that the right to sue alone did not

translate to the conclusion that GUCLT suffered constitutional injury-in-fact, as it had

previously held that a plaintiff "lacked all substantial rights . . . because it did not have the

right to settle litigation it initiated without prior written consent of the *licensor*, even though it had the right to sue *and* an exclusive license to the patent." *Id.* at 1341–42 (emphasis added to "licensor") (citing *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 979 (Fed. Cir. 2005)). As GUCLT did not hold the right to exclude, it lacked standing: "For any suit that GUCLT brings, its grievance is that the exclusionary interests held by AHLT are being violated. GUCLT is not the party to which the statutes grant judicial relief." *Id.* at 1342 (citing *Seldin*, 422 U.S. at 500).

To determine whether GUCLT had standing, the Federal Circuit said its first task was to "understand [GUCLT's] rights to the patent at the time this suit was initiated." *Id.* at 1338. In this case, the Court must determine Qimonda's rights to the patent not at the time suit was initiated, but at the time of this jurisdictional challenge—which is after Qimonda entered into insolvency proceedings in Germany and after Jaffé's appointment as insolvency administrator. *See Schreiber Foods*, 402 F.3d at 1202–04. With respect to licensee standing questions, the Federal Circuit has said its task is to "ascertain the intention of the parties and examine the substance of what was granted" by the agreement. *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1378 (Fed. Cir. 2000) (citing *Vaupel*, 944 F.2d at 874–75). The question in licensee standing cases is whether the agreement or agreements at issue "transferred all substantial rights . . . and whether the surrounding circumstances indicated an intent to do so." *Vaupel*, 944 F.2d at 874. Similarly here, the question is whether the opening of Qimonda's insolvency proceedings had the effect of transferring all substantial rights from Qimonda to its insolvency administrator, Jaffé. Particular terms or labels the parties use to describe their legal rights are not dispositive.

The crucial issue is: what rights in the patent "bundle" of rights does Qimonda have? *See id.* at 875 (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)).

As noted above, the legal interest created by statute, and bestowed in a patent grant, is the right to exclude others from making, using, selling, or offering to sell the patented invention in the United States. The parties agree that in his role as estate administrator, Jaffé has complete governing and managerial authority over Qimonda's assets, both in Germany and the United States. The parties also agree that Jaffé has the authority to enforce, license, transfer, and assign Qimonda's patents. Indeed, LSI notes that Qimonda does not dispute, and presumably concedes, that "Dr. Jaffé's primary objective as Qimonda's insolvency administrator has been to monetize Qimonda's patents through licensing, sales, and litigation." (Def.'s Reply 2.)

Despite this, Qimonda argues that it holds on to "legal" title, and therefore has the same patent rights today as it had at the beginning of the case.  Qimonda states that while it is true that Jaffé is Qimonda's representative in the United States, Qimonda still exists as a corporate entity. Jaffé has simply stepped into the shoes of Qimonda's management board and assumed its authority to enforce, license, transfer, and assign Qimonda's patents. The management board possessed these rights before Qimonda's insolvency, and although Jaffé possesses them now, his rights are no greater than the rights of the management board before him. Qimonda contends that as it always has, and continues, to "own" the patents at issue in this case, it still has standing to sue. Should the Court believe that Qimonda does not have standing to pursue this action, Qimonda asserts there is nothing more than a cosmetic issue that can be easily remedied: Qimonda proposes to alter the caption or amend the Complaint to reflect Jaffé's role as Qimonda's insolvency administrator.

Qimonda's assertions concerning "legal" title are insufficient to raise a genuine dispute as to any material jurisdictional fact. LSI has set forth facts that indicate that Jaffé, and not Qimonda, possesses "all substantial rights" in the patents at issue in this suit. Qimonda's insistence as to its holding of "legal" title, supported only by Jaffé's affidavit, is nothing more than a label—a description of rights—that is not dispositive. Looking past Qimonda's description and to the substance of the matter, there is no dispute between the parties that it is Jaffé, and not Qimonda, who possesses precisely the bundle of exclusionary rights bestowed upon a patentee through a patent grant: it is Jaffé who has the right to enforce, license, transfer, and assign Qimonda's patents.  In short, LSI has shown that Jaffé has both the right to sue on the patents *and* the right to exclude. Qimonda therefore now lacks a legally cognizable interest in the outcome. Accordingly, Qimonda no longer has standing to sue, and this case has become moot.

In light of this conclusion, Qimonda's proposal to alter the caption or amend the complaint should be addressed. At the hearing, Qimonda argued that should the Court find Qimonda lacks standing, Jaffé should be joined under either Federal Rule of Civil Procedure 17(a)(3) or 25(c). Substitution issues under these rules are not peculiar to patent law. Therefore, the Court must apply the law of the regional circuit. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1357 (Fed. Cir. 2001). Rule 17(a) is of no help to Qimonda, because Rule 17(a) governs the substitution of the proper plaintiff—the real party in interest—at the commencement of the lawsuit. *See Miller v. Longacre*, 172 F.3d 44 (4th Cir. 1999) (unpublished table decision); 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1958 (3d ed. 2011). The crucial issue is whether Qimonda may resort to Rule 25(c), which addresses the impact of transfers of interest during the pendency of the

14

litigation. The Court has been unable to find any circuit precedent addressing the issue of whether a new plaintiff may be substituted under Rule 25(c) where jurisdiction is challenged before the substitution motion, and the jurisdictional challenge is ultimately successful.

The Sixth Circuit faced this issue in a similar context in *Corbin v. Blankenburg*, 39 F.3d 650 (6th Cir. 1994) (en banc). In *Corbin*, the *en banc* Sixth Circuit reversed a divided panel's affirmance of the district court's decision to dismiss an action under the Employee Retirement Income Security Act ("ERISA") where the trustee of the defined benefit plan who had brought suit resigned his trusteeship, and the defendants moved to dismiss for lack of subject matter jurisdiction before the plan's former trustee ever moved to substitute his successor. *Id.* at 651–52. The district court reasoned that while the former trustee had standing at the beginning of the suit, he lost standing upon resignation, depriving the Court of subject matter jurisdiction. The district court said it was constrained to ignore the substitution motion, and dismiss the case, because "Rule 25(c) cannot be used to restore jurisdiction once it is lost." *Id.* at 652 (internal quotation marks omitted). The *en banc* Sixth Circuit reversed the panel, relying on "hornbook" trust law holding that an "action brought by a trustee is not ordinarily abated by his failure to continue in his office." *Id.* at 653 (citation and internal quotation marks omitted). Looking primarily to trust law principles and ERISA itself, the *en banc* majority said nothing in ERISA "suggests that a civil action brought by an ERISA trustee is personal to the particular individual who held the office." *Id.* The majority conceded it was true that a procedural rule could not be used to restore jurisdiction once it was lost, *cf.* Fed. R. Civ. P. 82, but said "subject matter jurisdiction was not *irretrievably* lost the moment [the suing trustee] resigned his trusteeship, and 'subject

15

matter jurisdiction, once it validly exists among the original parties, remains intact after substitution.'" *Id.* at 654 (emphasis added) (quoting *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971)). In the majority's view, the successor fiduciary could step into the shoes of the original fiduciary who brought suit in a court vested with jurisdiction, and the court was not deprived of jurisdiction, because "the 'stepping in' relates back to the time when the original party had standing to sue." *Id.*

Joined by two other colleagues in dissent, Judge Celebrezze wrote he did "not believe the proper question [wa]s whether ERISA mandates automatic abatement, but rather whether the plaintiff's lack of standing during the pendency of th[e] action deprived the district court of subject matter jurisdiction." *Id.* at 655 (Celebrezze, J., dissenting). As the majority agreed that the former trustee lost his standing upon the effective date of his resignation, Celebrezze framed the issue as whether a successor trustee could be substituted for the resigned trustee "for the purpose of recapturing standing to proceed with the action." *Id.* The dissenters would have held in the negative. On their reasoning, the former trustee had no interest to transfer at the time he moved the court for a substitution. Therefore, the successor trustee merely stepped into the shoes of a party who lacked standing to sue. *Id.* at 656 (citing *Ransom*, 437 F.2d at 516). The majority's novel theory that subject matter jurisdiction was not "irretrievably lost" because "'subject matter jurisdiction, once it validly exists among the original parties, remains intact after substitution,'" *id.* at 657 (quoting majority opinion's application of *Ransom*), failed to account for the fact that *Ransom* held that subject matter jurisdiction remains intact after a substitution where it already "validly exists." *Id.* Without substantiation, the majority

extended the relation back doctrine from the context where it is logically applied—

amendment of pleadings—to the jurisdictional arena, which would

> create a plethora of problems in the judicial process. Logically, if every
> jurisdictional problem could be cured by relating the successor's standing to
> the commencement of the suit, there would be no need for rules delineating
> the time and manner of substitutions. Thus, by adopting the position of the
> majority, we undermine the integrity of the judiciary to determine its own
> jurisdiction by transferring to the parties the power to manufacture and
> recapture jurisdiction at will.

*Id.*

The Court finds the *Corbin* dissenters' reasoning persuasive, especially to the extent

that the majority's decision was driven by its view that civil actions brought under ERISA, a

remedial statute, are not personal to the trustee. As previously established, the Court is

obliged to evaluate jurisdiction at the time of the challenge. At that point in time, Qimonda

no longer had standing to sue, and this case became moot. Qimonda's invocation of Rule 25

at the hearing was simply too late, as Jaffé could only step into the shoes of Qimonda when

it had already lost standing to sue. The Court notes that although the Federal Circuit has

held that a temporary loss of standing before judgment can be cured where the

jurisdictional challenge occurs *after* the party holding all substantial rights has been joined,

*see Instituform Techs., Inc. v. Cat Contracting, Inc.*, 385 F.3d 1360, 1371–72 (Fed. Cir. 2004),

it has expressed "grave doubt" that the Rule 25(c) substitution vehicle may be invoked to

continue an action at the time the plaintiff has lost standing to sue.  *See Schreiber Foods*,

402 F.3d at 1204 & n.6 (following *Cat Contracting* but rejecting plaintiff's alternative

argument that case could have continued under Rule 25(c) even if plaintiff never

reacquired requisite stake in the litigation).

While this may seem to be a harsh result that elevates form over substance, it is not the place of this Court to find jurisdiction when it may seem more convenient and practical to do so.[10] Following this course would in fact allow the rules governing the manner and form of litigation, at a party's behest, to override substantive constitutional limits on federal judicial power.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS LSI's Motion to Dismiss Under Rule 12(b)(1).

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this  7th   day of March 2012

---

[10] This dispute has already landed back on the Court's desk. *See* Complaint for Patent Infringement, *Jaffé v. Qimonda AG*, No. 3:12-CV-025-JRS (E.D. Va. Jan. 10, 2012), Doc. No. 1.